turns to Set Capital LLC v. Credit Suisse. Good morning, Your Honor. This is Michael Eisencraft, and I represent plaintiffs' appellants in this matter. I'd like to discuss three things with the court today. The interdictive intraday value allegations, our Section 11 claim, and the market manipulation scheme. The district court below found that the intraday indicative values that were disseminated by defendants were false and misleading, that they were wildly inaccurate, and that had either Credit Suisse or the Janus calculation agents known that these statements were false, they would be liable under the securities laws. The district court, however, found that it was most plausible that the calculation agents did not realize that the numbers they were disseminating to the market were false, and on a motion to dismiss, granted the motion to dismiss and dismissed the claim entirely. Now, we respectfully disagree with the district court and think it's far more plausible that the calculation agents did realize that the prices at issue were false and misleading. We think this for a few main reasons. First of all, this was not a price that was disseminated erroneously for a second or five seconds. They disseminated an incorrect price for an hour, and in market time where time is measured in milliseconds or even microseconds, the hour is an eternity. Moreover, these prices were not off by a penny or ten cents, they were off by 80 percent, 90 percent. Counsel, this is Judge Kuehler. Is it your argument that the hour, when the price didn't move, was an intentional manipulation? Uh, no, Your Honor. We're alleging that the price was false. We don't deliberately cause the falsity of the price, just that they knew when they were disseminating it, that it was false. It's a false, uh, they didn't, we don't, we don't allege that they deliberately created the false price. But they knew it was false when they distributed it or allowed it to stand? Yes, Your Honor. Is that, that's the nature of your claim? Uh, for, for, for the, uh, for this, this aspect of the claim, the, the, uh, indicative value, uh, that was off by $20, uh, on ETM, yes, that they knew that the, that they knew that the fair statement was false. This conference is being recorded. Only the main conference is recorded. Uh, was the, was the, was the, um, uh, this is Judge Walker. What happened, I gather, was that the price just stayed the same all the way through. Is that right for the, for the hour? Essentially, yes, Your Honor. And you're saying that you kind of put them on, would have put them on notice if they were watching it, that there was a problem? Exactly, Your Honor. The way I, I analogize it is, if you're watching a baseball game, and this is a really important baseball game because this was pretty much the most important hour in the history of the security, trading volume over 160 times normal, the price was plummeting, and then suddenly, you know, a pitch froze for an hour and nobody noticed is what they're claiming. Um, so yes, the, the, the simple, the simple fact that it froze aside from the fact that it was wildly inaccurate should have given them some notice that, yes, something's wrong here. This is Judge Lynch, counsel. Uh, uh, I like your analogy, uh, and I think the question I have is, in effect, what is the, uh, basis for the inference that the game is actually being watched? And, uh, of course, in one sense, I understand that, uh, the price is important to a lot of people. Uh, at the same time, uh, the price is supposed to be updated every 15 seconds, which says to me that that must be an automated process, not something that someone's manually doing. Uh, so why, why is it clear that the calculation agents are monitoring the, uh, putatively or presumably, and maybe you can tell me I'm wrong, but it's presumably, uh, automated changes or non-changes in the price? Well, Your Honor, we, we don't know for sure whether it's automated or not. Um, defendants, uh, claim that- You think that someone is, is actually sitting there watching the, uh, VIX price and every 15 seconds calculating manually the changed price of the, uh, XIV notes and then, uh, uh, entering that price? I, I, I agree it was likely automated. I just don't know for certain is all I'm saying. It might've been someone doing something. It's just beyond the four corners of the complaint. I just don't know. Um, but I agree it was likely to be automated. Now, um, I mean, the calculation agents don't have many responsibilities. Um, they, they do get, you know, paid a certain amount of money and their responsibilities are minimal. But one of their responsibilities is to detect market disruption events. Um, so I don't know, you know, uh, you know, we haven't, there's been no discovery in this case. I don't know what sort of, do they have an alarm that goes off? Do they have some computer program that's supposed to detect when the price is off? They have someone there to check. I don't know how they're supposed to detect market disruption events. Um, but that, that's, that's part of what they do. They have the discretion to declare market disruption events. And also they're publishing these prices. Yes, it is via formula, but you know, one would hope that they had some sort of mechanism for making sure they're accurate when they send them to the entire market via NASDAQ. Um, so I, there's certain things I don't know, but, um, you know, if a price is frozen for an hour, you know, whether it be, you know, be a market price for some stock, whether it be automated or not, there should be some mechanism, someone watching, whether it be a robot watching or a computer program or a person to say, Hey, this is wrong. And we also allege that at the same, I mean, Walt is not admittedly not the same corporate entity. Another division of Credit Suisse was trading an enormous amount of the VIX futures contracts that were underlying at the correct price that were driving the price, the true price of these, uh, of these securities. So, you know, Credit Suisse, the calculation agent, you know, under, you know, CSI and then it's trading arm was trading a quarter of the market at the exact same time, but the price is frozen. They didn't, you know, I presume, like I said, there's a lot, I don't know. This is, this is pre-discovery, but you know, that the pitch was frozen for an hour and no, and it's, it's not, I just don't think it's the most plausible explanation that no one noticed. Are you suggesting, I don't know exactly what, I don't recall what the complaint actually says in this area that the division, the trading division that was buying heavily would also have been paying attention to the, uh, to the intra, intra, uh, value, uh, and, and would have noticed that it was flat and, um, that would have raised an alarm on their side that they were, it could have brought to the attention or should have brought to the attention of the, of the entity responsible for monitoring this. Correct, your honor. Yes. Um, we, we do allege that the, that the trading that was occurring at the same time, you know, gave them additional knowledge, um, that it wouldn't have given them additional knowledge unless somebody told them, but it was, would have been likely unless you're going to say corporate knowledge is everywhere, uh, imputed to everybody under these circumstances, but you did say it was a different division. So, um, assuming that it's a different division and would require actual knowledge, you would say, yeah, take it. You're saying that discovery could reveal that, uh, could explain why, uh, the, the trading division never mentioned it to the, to the monitoring division. Exactly. And we do allege that credit Swiss was benefiting, um, from this artificial price. Um, like this trading arm was, um, making a lot of money because it was trying to drive the price down, but it was also selling securities into the secondary market. So, you know, there is a reason for them to do to, for them to, to, uh, to not tell about the, about the price. Okay. Um, so the second part, I mean, cause this is a multi multi-part complaint. Uh, the second thing I'd like to discuss it, uh, are the, uh, section 11 allegations. So, um, about a week before the February 5th events, uh, credit Swiss issued 16.75 million of these ETNs into the market. Um, and the district court found that, uh, plaintiffs allege that when these future hedging transactions, which would in turn trigger liquidity crunch and acceleration events and destroy the security. And the district court found that January, 2018 supplements undisputedly did not disclose that intention. And we think right there, that's a materially false misleading misstatement or omission, um, in the perspective. Isn't that essentially your misleading statement to the extent that this was all a scheme from the start, but if it's not a scheme from the start to have all of this happen, uh, then why I'm not sure. I understand the basis for saying, uh, the, that credit Swiss actually knew what the effect was going to be. It seems to me, they couldn't tell what the effect was going to be. The whole thing would have turned out very differently. Uh, if the, or they wouldn't predict that it was certain that this would happen, they'd survived through two other such, uh, episodes, uh, without, uh, this kind of, uh, crash happening. Uh, so why isn't it enough that they said what they said, which is basically we put a skull and crossbones on the front of this. We tell you that we're in a conflict of interest position with you. We tell you these are highly speculative notes. Uh, we tell you that you shouldn't count on the fact that our hedging isn't going to have, uh, an impact on the price. Uh, the, it seems to me the only way that you can succeed. And I, and I'm going to be interested to hear your argument on the manipulation front, uh, is by establishing that they knew this was going to happen because they planned it to happen and wanted it to happen. Uh, yes, Your Honor. And the, the, the scheme and the section 11 claims are interrelated as you, as you discussed. Um, and I think what you're getting at here is kind of actually the heart of where the district court, uh, made an error. The district court, um, said that, Hey, you know, credit Swiss didn't know what was going to happen. Markets are unpredictable. He couldn't predict when I was issuing these shares and it couldn't, you know, that the market was going to react this way, you know, and I think it said, why would credit Swiss take a bank shot? Um, as opposed to just, you know, falling with the mark, you know, just taking off or, you know, acting opportunistically as the market developed. But I think, but you know, with all due respect to this accord, that's not what we allege. That's not economically correct. Um, we allege that it was statistically certain that, you know, with eventually the price of X would, uh, spike. Um, so it's like the way I know, excuse me, can I just interject something at this point? And this, I think is your side supportive of your, your position, uh, that, um, they knew that it was going to spike again, that had three prior incidents. And I think the complaint alleges that they were, they were considerable spikes. Uh, and, uh, as after the third spike, uh, they, they, the evidence that they, they really realized that this could happen again was with the, uh, the, uh, 1916 announcement, June, 1916 announcement in which they were, uh, increasing their hedging abilities because they were afraid that they would not be able to properly hedge. Uh, if, if there was another spike, is that, is that, is that what your theory is? Yes. Better, better than I would have expressed it. Thank you, your honor. Um, can I work for the question? Um, when, uh, this is not normal market behavior, is it? I mean, this is market behavior, but the market is controlled by credit, credit suisse to some extent, not for the VIXs, but, but, but, but, but for the XIVs, in other words, when to buy, when to sell, they, they can decide when they want to buy it back, um, uh, with it, with an acceleration event or just a, a, on their own, on their own desires. So it's, it's not like a normal market. And the second question I have is that when you're talking about this kind of a situation, this is not normal trading in a free, open, unaffected market with which, which is just, uh, uh, operates on the basis of general supply and demand. This is, is, is much more controlled. Uh, and, and, uh, my other question, my, my other observation here is I, I don't understand why they issued, and this will be for the other side, why they issued the 16 million of XIV notes in January. I just don't understand why they would do that. Um, so anyway, maybe you can help, help me at least present what your, what your position is on this. Absolutely, Your Honor. Um, and we allege that, that, that, that 16, that issuance of the 16.75 million shares was the key because as you pointed out, while they, while they, you know, this, this market is somewhat controlled because they issue it, they can call it. 16.75 million shares means that in a spike they have to hedge those, which is, means they have to hedge 16.75 million more shares. And the three previous spikes when it went 30%, 40%, but the product still survived. Now you're putting, you know, double or triple or quadruple the pressure on the underlying VIX futures because you have to purchase that much more hedge. So that's what they were doing. They knew that by selling this massive amount of new securities, they were destabilizing their process. Their product, the XIV, was now bigger essentially than the, than the VIX futures. And these time periods, it would overwhelm it. That, that's the heart of our case, that they knew that, you know, and, and they, you know, Credit Suisse talks about in its prospectuses and, you know, statements that they model everything. They're very, their risk is their business. If you put that much more weight on a scale. You know, I was just going to alert you that your time has expired. Why don't you finish the sentence? Well, I'd like to hear a little more. Just a complete, complete exposition of this. Yes. Okay. Complete your exposition. I will do so briefly. Yes. So what, what, what they're doing is they're imbalancing the market in a way that they know that the next spike, the product's going to die. That's what the sale of the securities did. They knew that was going to happen when they issued the securities. And that is a material and misleading statement. In the, in the prospective supplement, because you didn't tell people, and it's also the heart of our market manipulation scheme, because it shows the enter, because you should foresee the predictable results of, you know, issuing 16.75 million more shares in the market. And as Judge Fuller said, my time is up. So I. Can I just ask one, can I ask one sort of dumb question? And really it's only idle curiosity. Why are these called XIV? My first thought was it isn't explained in the record as far as I know. And my first book was, that's just VIX backward. But then we got a, because they're the inverse, but then I got this 28 J letter talking about a ZIV security that was at issue that seems very similar, if not identical, that Judge Nathan had a case. I think it was with, and that, sort of screwed up my theory. So two questions, I guess, is just out of curiosity, why, what is the name XIV symbolized? And then more substantively, are the ZIV securities the same thing or something very similar? And why are they named that, if you know? My assumption was the same as yours. My guess was that XIV got there first. So got the, the prime marking slot there. I don't know much about the, the security at issue in the 28 J letter. I, you know, we respond to the 28 J letter, distinguishing the case and, you know, it didn't allege the same fraud and alleges the flat line issue here. But I don't know about the security itself. I'm not sure. Well, I guess we'll hear from the other side. Maybe they'll be able to tell me. Thank you. Yeah. I got the same thing though, because the same, you know, it probably would have, it's probably something slightly different. Maybe a tie-in. Counselor, you have reserved three minutes for rebuttal, for rebuttal. We'll hear from Credit Suisse. Good morning, Your Honor. May it please the court. This is Herb Walker. Perhaps I should just maybe address some of the open questions that were raised by the discussion with Mr. Isencraft in the first instance. First, I think Judge Walker, in response to your question, did the price move between 4.09 PM and 5.09 PM? I think Mr. Isencraft said it essentially did not, but in fact it did move. The Janus defendants actually submitted into the record as part of their did show movement between 4.09 and 5.09, so it is incorrect to say that it was exactly flatlined for an hour. I think the second question, I think from Judge Lynch, why do you think that, you know, this game is being watched? Isn't this an automated process? I mean, that is true. Our understanding is that it is an automated process. In other words, S&P calculates the VIX Futures Index, and that is an automated process to publish that, and then the indicative value is an automated process, but simply it's a mathematical formula. You take the VIX Futures Index number and it converts into an indicative value for XIV. Okay, well now this is Judge Lynch again on this very question. That's pretty much what I assumed, but as Mr. Isencraft points out, it raises the question, what are the calculating agents actually doing on an ongoing basis? You know, is their role simply to have created the computer program that makes this happen, or are they not supposed to be monitoring? After all, they have the authority to declare a market disruption event, and this is exactly the kind of thing, it would seem to me, that that responsibility has in mind. If the VIX Futures are not being properly recalculated for an extended period, then the XIV price is not going to be properly recorded. The answer to that question is that, again, the actual every 15-second publication of that number is automated, but in terms of market disruption events and other obligations that the calculation agents have, if you look at those obligations, a market disruption event, for example, there is no expectation in the offering materials that those decisions will be made every 15 seconds. In other words, a market disruption event, for example, is a situation where at the end of the trading day, if the closing indicative value cannot be properly calculated based on this automated process that we've been talking about, the calculation agents have the power to go and say, okay, what should this price have been, and then publish a price, a closing price, that is different from the one generated by the automated process. But again, that's something that happens after the end of the trading day. And these other things, substituting a different index when this index isn't working, those are multi-day processes. A committee would have to get together and talk about what happened yesterday, and then talk about what index should we replace it with. So there's no expectation with respect to any of these things, A, that Credit Suisse or Janus have a duty to the class to fix things every 15 seconds. And with respect to those undertakings that they have made, those are things that cannot be done on a moment's notice. And so here, we're talking about a one-hour flatline period, but the truth is that the trading day in XIV ends at 4 p.m. In the VIX futures market, trading goes on in the normal market hours until 4 p.m. Plaintiffs have alleged that we did all of this hedging that disrupted the VIX futures market between 4 p.m. and 4 p.m. The plaintiffs don't allege that there's any disruption in the calculation. In other words, the flatline doesn't start until, I think they say, 4 p.m. to 9 p.m. So if we have a trader, if Credit Suisse has a trader in the market doing these hedges, the truth is they're only in the market for about six minutes after the flatline occurs. So they really only have six minutes in which they might have noticed what was going on in the VIX futures market. And further to the point that the district court made, Credit Suisse has sales and they have trading. So there's a trading group that is responsible for executing hedges in the VIX futures market. And there is a separate sales group, different people, who are responsible for the indicative values because that's telling them the value of the XIV product. But the VIX futures trader is in a different group. And so as the district court observed, there's no allegation in the complaint that would suggest that there was any person at Credit Suisse who was in the VIX futures markets, who therefore would have seen what was going on in those markets, who would have then had access to the indicative value for XIV and compared the two and noticed that something was off. And certainly there's no allegation that anybody did that or could have done that in a six minute period. And immediately upon noticing that, forming a committee, making decisions and issuing some response or some statement to the market. So simply not practical or plausible to suggest that that could have or would have or did happen. Judge Lynch again, turning to the, I think that sounds like that's your position on the intraday indicative flatlining piece of this. Could I ask you to address Judge Walker's question earlier? What is the thinking behind issuing 16 million notes into a market that more than doubles what's in the market at a time when the market price is extremely high? When at least going to the allegations of the complaint, Credit Suisse is actually trying to reduce its exposure in this area with what must be the knowledge that that's going to require a great deal of hedging that's going to drive that price at which you sold these things down in the relatively near future, even independent of an actual market spike. And then that if there is a spike in the I guess I find it hard to believe that someone who's in the process of issuing those notes isn't strategizing about what the possible future scenarios are and what's going to happen next week. That's one thing to say, oh, we opportunistically sold because we saw we could sell at $140 or $160 or whatever and make a lot of money in the short term just on the sales. But then no one's thinking about what's going to happen next. Yeah. Your Honor, the answer to that question is in the allegations of the complaint. Your question fairly assumes that this generates risk, that there will come a point in time when Credit Suisse is going to immediately try to hedge a $1.6 billion exposure to XIV. But the plaintiff's complaint makes perfectly clear throughout the complaint that Credit Suisse hedges all along. The business model here is not to issue notes and cross your fingers and hope that the price of those notes doesn't go up. The business model is, and plaintiffs lay all of this out in the for redeeming the notes. There are some daily fees that Janice earns, but the business is not to take enormous risk. Just make it that. Counselor, the problem, the argument against you there is the fact that there was pressure. In fact, activist investors were thinking about breaking up Credit Suisse because of its very low security. You make a point that, in fact, they did reduce their risk in two other securities, which they got rid of. But then against all of that, there's this massive purchase of $16 million, a massive sale of $16 million issuance. It just doesn't compute for me as being normal. It doubles the amount outstanding and the hedging was already anticipated back by the June statement. And therefore, hedging is obviously a component of all of this trading. And so, the idea that now there's a liquidity crunch because of the huge number of XIVs in VIXs, so that any hedging there is going to drive that price up for the VIXs and drive the XIVs down. It's not rocket science. And if that's the case, if it's all understood, then I don't understand why they would expose themselves to all that. Your Honor, the simple answer, again, is in the complaint. Credit Suisse, this was a very popular product. The value of XIV over the years from when it was created in 2010, the value went up exponentially because market volatility was low. And so, there were articles in the press talking about how popular and successful this product was. So, there was great demand for the product. So, Credit Suisse agreed to issue more ETNs in January of 2018 because it was a popular product. There was demand for the product. The question was- Where was the demand from? From investors. From people who wanted to invest in that? Yes, Your Honor, from people who wanted to. They were basically taking a bet that market volatility would remain low, that price changes in the market would be relatively insignificant from day to day. So, and that had been true. It was a very low period of volatility. So, as a result, the value of XIV was quite high. So, there was- That's one explanation. And that explanation, it might be true as a matter of law and summary judgment. But my question is, on the pleadings, which is all we have to go with here, the plaintiffs have alleged a different scenario, and one that arguably makes sense, given the fact that the hedging was so prominent in everybody's minds, which is evidenced by the June 16th agreement, and after the last fight, or announcement after the last fight. And so, I mean, there are allegations of scienter, and maybe you can get to me on this. First question I have is, how can you manipulate, because I think the district court found a manipulation here, how can you manipulate without intending to do so? That's one question. And they found that no representation covered the manipulation. That's the complaint at page 27 of Judge Netburn's opinion. And then, you had to have known that a market volatility spike would drive up the VIXs, which would lower the XIVs, because that had happened three times before. And then finally, the defendants did provide CS with increased ability to hedge against volatility spikes, which would drive down the XIVs. And the 7.16 announcements made that clear, their intent to hedge, that hedging would be important. And then finally, let me just say, they tripled the size of the XIVs. Why wasn't it clearly obvious that any hedging would collapse the XIV market? So, those are my concerns here. And looking just at the complaint, there is no ability right now to do anything other than work with the four corners of the complaint. Understood. So, just looking at the complaint, one of the central allegations of the complaint, and Your Honor has pointed to it several times, is the fact that in the middle of 2016, Credit Suisse made a public announcement that it would now have the ability to hedge its exposure to XIV by entering the swaps transactions with its counterparties. Swaps transactions basically give you the opposite of the XIV transaction. So, if, for example, the price of XIV moves upward, Credit Suisse would owe more money, but a swap would pay Credit Suisse the exact same amounts of money. So, by Credit Suisse, by starting a program to enter into swaps, that obviated the need to go into the VIX futures market. So, then why did they do it? Why did they go into the VIX futures market? Why did they go into the VIX futures market? It's a good question, Your Honor. The answer is, there is no allegation in this complaint that Credit Suisse actually did go into the VIX futures market. That is sheer speculation. We're all talking about an assumption here, which is that Credit Suisse went into the VIX futures market at 4 p.m. on February 5th, 2018, and bought 105,000 contracts, 167 times the normal volume. There is not a single fact in the complaint that supports that notion. Plaintiffs get that number by simply taking $1.6 billion, let's assume $1.6 billion in XIV. How many contracts would Credit Suisse have to trade at that moment to hedge the entire exposure, as though they had never hedged any of that before? Which, based on everything else you see in the complaint, is utterly untrue. The complaint repeatedly alleges that throughout the history of XIV, Credit Suisse hedged through the VIX futures market, and then they hedged by virtue of swaps. So, the plaintiff's own complaint requires the conclusion, but it could not possibly be that Credit Suisse had to or would have traded 105,000 contracts on February 5th, because presumably the vast majority of their XIV exposure was already hedged. The complaint alleges that, I think, as the price of VIX went up, I guess there was a general decline in XIV, the price of VIX went up, that they came in and purchased. Now, VIXs, and you're saying that that's false. I'm saying it's conclusory, Your Honor. I'm saying there's no evidence, no documents, no witnesses. They just made it up. They made it up? Is that what you're alleging, that they made it up? Yes, Your Honor. Well, what I'm saying is that when you look at the complaint, they tell you how they assume 105,000 contracts, and they simply do a calculation that says, what would it take to hedge $1.6 billion, but that calculation ignores everything else in their complaint, which emphasizes that Credit Suisse had already hedged in significant and a variety of ways. Well, where are their facts, where are their facts anywhere in the complaint or in the record about precisely what Credit Suisse was doing to hedge? We know that they say they're hedging, and there are different ways in which that could be done, but no one knows exactly what was happening there. It seems to me both sides are engaged in certain speculations that almost contradict each other. You're saying, oh, well, we were already hedged, but I read your brief as saying whatever was being done in the marketplace in early February by Credit Suisse shows that it couldn't have profited from the dramatic drop in the price of XIVs because they were hedged. These are all factual questions, it seems to me. The plaintiffs alleged it happened one way. You're saying that's wrong. Okay, isn't that a fact question? Isn't that why we want to find out whether these factual allegations, which we're supposed to take as true, are true or they're not true? Your Honor, it is the plaintiff's burden, of course, to demonstrate that their theory is at least as plausible as any benign alternative. If you recall in the ATSI case, where Judge Walker, you made the opinion, that was a situation where the defendants were accused of engaging in a short-selling scheme to cause a death spiral, but the allegations were rejected. There was no finding of manipulation. There was no finding of scientific, because Judge Walker, you specifically found that it was only speculation that the defendants engaged in short-selling. Plaintiffs had not made any allegation that would necessarily lead to the conclusion that they, in fact, had engaged in short-selling, effectively putting forward no fact-based allegations. What we are suggesting is that is the same thing that is happening here. Essentially, they're suggesting that we traded in the VIX futures market in enormous quantities, and we're saying that is inconsistent with other allegations in the complaint. It's not our factual position. We're just looking at the hedging allegations in the complaint and saying, you couldn't have traded $105,000 to hedge if you had already been hedging. They allege without any factual support that we made $500 million. Again, when you look at the actual allegations of the complaint, they calculate that by figuring out how much revenue we would generate from the sales of notes without taking any account of the opposite impact of the hedges that they say we had engaged in all along the way. They even have in the complaint some very specific allegations on a situation where through hedging before 2018, we actually saved hundreds of millions of dollars by virtue of our hedging. There are specific allegations in the complaint that we did hedge in significant quantities well before February 2018. While yes, it is true that we have to take as true the allegations of the complaint, that is not so if they're conclusory, if they make no economic sense, if they're contradicted by other allegations of the complaint. Is there anything in the prospectus that tells us that the way this product works for Credit Suisse is on the fees and that it is Credit Suisse's intention to be perfectly hedged in such a way that they can neither gain nor lose by movements in the price of XIV? Your Honor, the offering materials do describe in great detail the fees that both Credit Suisse and Janus would earn in connection. I'm sure you make a lot of money on the fees. The question is, is there anything in the prospectus that says you do not make money and will not make money by rises and falls in the price of this product? Is that representation made? No, Your Honor, that's not made. Obviously, there is a significant discussion of the fact that Credit Suisse may hedge and that could have a negative impact on the fixed futures market and XIV investors, the value of their notes and all of those disclosures. Is there anything in there that describes the hedging strategies in such a way that it follows that there's no way that you could have made money on this set of transactions? It seems to me your argument in the brief that I read was that it's economically implausible that Credit Suisse had motive to drive the price down. Your Honor, we do make that point. Of course, we cite many other reasons why the entire scheme is implausible. There's nothing in the offering materials that says we will not make money on hedging. In fact, there is a passage in the offering materials that says we may make money on hedging. You also say there's no reason to believe there's no reason to believe that our hedging activities will have a material impact on the level of the VIX futures index. And that's incompatible with the plaintiff's theory and complaint, it seems to me. But we do go on to disclose, Your Honor, that the hedging may adversely affect the market price of such underlying futures contracts. Theoretically, theoretically, it can do that. But we have no reason to believe that our hedging activities will have a material impact on the level of VIX futures index. It's the same thing for the opposite, the XIVs. So that's a rather strong statement, which counters the idea that it doesn't really give a complete picture of the hedging activities, it seems to me. Well, I think that's, sorry, go ahead. Okay, you agree with that. Now, what do you say? It looks to me like the district court, and I'm reading both the district court and the magistrates together, district court concluded that there was a manipulation here, but then just found no scienter. And I have a problem with understanding how you can have such a thing, a manipulation, which usually requires intent. And it seems to me that the district judge actually, the magistrate judge actually found such a thing, that there was an intent on page, I think it's 26 or 27. And that, yeah, she says that in that paragraph, plaintiffs claim that the Credit Suisse and the individual defendants engaged in a manipulative scheme in violation of 10b-5a, issuing more XIV notes in January to trigger, with the intent of triggering liquidity crunch, destroying the IV notes value and accelerating the notes redemption at a loss for investors. And then you argue that they've not fled any underlying misrepresentation or that argument of yours is unavailable. Now, apparently, and I have to go back to this, there is a statement that she makes a finding of a manipulation here. Your Honor, yes. Does she make such a finding? Your Honor, she does indicate that with respect to the first element of a 10b manipulation claim, she believes the allegations satisfy that. Effectively, I think what she was saying was, obviously, if the parties have intent, then this would be a manipulation. It goes back to something that plaintiffs have said, sometimes the only thing that separates perfectly legitimate activity from manipulation is the intent. So I think she was looking at the alleged volume of activity, the time itself. If there is intent, then there would be a manipulation. We obviously disagree with the district court's conclusion on that first element, but certainly, I think that's what she found. My problem is that Santor is often a product of, it's often developed through discovery and it's developed through circumstantial evidence because nobody's actually made statements about any of this stuff. And that's why it's so difficult to deal with. As long as there's an adequate leading on the question, then normally, this is a matter for discovery and possibly trial, possibly not, later on. Why wouldn't that be true here? We've asked a lot of questions that go to the issue of intent, peculiarities of this transaction. Why wouldn't Santor be something that should wait and not be decided? Yeah. I think the second circuit has, obviously, in the Supreme Court and tell us, they have set a bar with respect to what needs to be on Santor at this early stage in the proceeding. And again, the burden is on plaintiffs to demonstrate that what they are alleging with respect to Santor is at least as plausible as any competing benign inference. Yes, but that's exactly the point. The question is, is it at least as plausible, not is it the most likely or that there's no other inference or that it's the most likely or more likely than the other inference? It's at least as likely. So it seems to me that you're in the position, I mean, yes, the burden is on them for the pleading, but in effect, unless you can establish that it is or persuade us that it is more likely, the innocent explanation is more likely than theirs, then they're in the position that we could draw an inference from what Judge Netburn referred to as the objective facts that are consistent with a manipulation. Well, that's one inference. You've got another one. And if yours is not more likely, and it sounds to me very often as what you're saying is, trust us, we're respectable. We wouldn't do that because there are different ways that this could have happened. Yeah. No, I mean, the district court obviously weighed all of those considerations, weighed the competing inferences, and obviously found that it was more likely that that just was not Credit Suisse's intent. Counsel, but the question is, what wasn't Credit Suisse's intent? I don't think the overall manipulative scheme and the motives that they've alleged necessarily answer the question because that's a very far-fetched thing that they sat back, Credit Suisse sat back and decided that prior to February 5th of 2018, that they were going to do that. This is, you know, and going way back to the issuance of it, going back to the issuance of the 16 million shares, that this was all their plan and a way of getting out of and sinking the XIV notes. But they knew enough to know that there was going to be a need for hedging, and they knew enough to know that hedging, at least with BIXs, would tank or sharply reduce the XIVs. And then they issued this large amount of stock. And it doesn't seem to me that you have to go and adopt every aspect of the plaintiff's pleading as to the scheme to find out that there might have been a plausible manipulation here. And that's all I'm saying. Counsel, would you respond to the last comment by Judge Walker? And then we will have to turn to for Jonathan. Sure. Thank you. Thank you, Judge Kula. Yes, look, with respect to this, I think we have to step back for just one second. You know, these are exchange-traded notes. This XIV product is just like many other products issued by Credit Suisse and other banks. It's a very well-known product in the market. It is not perceived as a product that is designed to fail or that is particularly susceptible of manipulation. And Credit Suisse got into that business, as the plaintiffs alleged, in 2010 without incident and proceeded to engage in that business for many years without incident and continue to increase the number of shares that it sold without incident. And all along the way, this did not present an enormous, as plaintiffs say, on a daily basis, Credit Suisse adjusted its hedges. So as they sold more shares, they adjusted their hedges. As market prices moved, they adjusted their hedges. So this is not a situation, according to plaintiffs' own complaint, where Credit Suisse had tremendous exposure or tremendous incentive. And again, if you just look at the notion that, I mean, the fundamental theory here is that the CEO and the CFO of one of the largest investment banks in the world woke up one day and said, you know what? This is an opportunity to make some real money. Let's exceed our own internal risk limits by 10,000%. Let's ignore all of the compliance people and legal people and risk management people at our bank and just risk the entire bank's future by taking on a multi-billion dollar exposure. And let's see if we can manipulate the VIX futures market, which by the way, all the trades in that market are the SEC has access to all of those trading records. All we're saying at the end of the day is that this was a normal product that Credit Suisse traded in, sold in a normal way. And the notion that Credit Suisse would have gone off the rails in this sense is implausible. We think much less likely than the benign explanation, which is that we were engaged in this in the VIX futures market at the time. Plankett's own complaint acknowledges that not just CS, but many other issuers of volatility-related notes and other traders were in that VIX futures market. And so everyone got caught up and everyone- Thank you, counsel. Thank you, counsel. We'll hear from Janice Distributors. May it please the court. This is Jason Halper. That will be three Janice Defendants. Your Honors, there is no allegation of market manipulation against Janice. The only allegations related to Janice are related to the intraday indicative value. And so that is where I will focus my remarks. We also believe that on appeal, plaintiffs have abandoned any claim against two of the three Janice entities. That would be Janice Henderson Group and Janice Henderson Distributors. And so we're really talking about a fairly narrow issue. It's did one of the three Janice entities knowingly put out a false IIV for that one hour on that one day. And the court is very familiar with the standards on Scienter and Pell Labs. There are simply no allegations in the complaint that rise to the level that this court has to establish Scienter and get over the pleading hurdles established by the court and the PSLRA. What are those? There has to be an allegation, a factual allegation, that Janice had information contradicting its statements. There is no such allegation. The allegation is that essentially Janice had access to the Mixed Future Index, which of course everyone knows because that's what Janice used to calculate the IIV. There's no allegation that that was calculated incorrectly during the period in question. There's no allegation, nor could there be, that Janice had the ability to independently calculate the Mixed Futures Index or had access to the inputs to the Mixed Futures Index. And of course, we submit it is, and as the lower court found, far more compelling in light of that, that Janice simply was not aware that S&T, which puts out the Mixed Futures Index, had stopped updating that index. As far as... Excuse me, Judge Lynch, as far as you understand it and as far as what's in the record, is the idea that S&T did continue to put out prices during this period, only it's the frozen price. And then when it hits your computers, in effect, your computers just recalculate to turn that into what the indicative price should be according to a formula. So that unless someone is noticing or aware that S&T's continued projection of the same price means that something has frozen, then as far as your systems are concerned, everything's just going according to normal calculation. Is that the idea? That's correct, Ron. And that's an important point because the index did not stop. It continued to publish. As Mr. Washer pointed out, the price did change somewhat, but overall at a somewhat frozen rate. You know, this reference to a market disruption event, that is a concept that is in the offering materials, that is the situation where if Credit Suisse determines it had difficulty hedging because of such an event, then the calculation engines can market disruption event. But what is that? That is disclosed as a suspension in trading or a failure to publish the index. That's not what happened here. And what happened is the would have been discretion to declare a market disruption event. And of course, that is discretionary, as Tom just acknowledged. And it is intended for the purpose of to enable Credit Suisse to hedge, not for the benefit of investors. So again, just to make sure I understand, as far as you're concerned, it happens is that at whatever time, 4.09, there's a publication by S&P of a VIX index price. And then at 4.09 and 15 seconds, there's another publication. It may happen to be the same price, but it's a new publication. So it's not the case that S&P says, oh my God, we're not sending anything out anymore for the next hour. Or something just breaks and nothing gets sent out at 4.09 and 15 seconds. Something gets sent out. It just happens to be the same as the last price. Is that what freezing means to you? Is that what you understand to have happened? That's exactly right, John. That is what is alleged in the complaint. And what we understand happened, including based on publicly available trading data, which is part of the record below. Right. And one other question, I think this may be my last one, my last one anyway for you is, how do you guys make money out of this? I'm going to be asking Mr. Eisencraft, because we didn't get to your side of this on his first argument. What is the argument for why you would have a motive to participate in putting out a false number or not letting the public know that there's a problem? And I have to imagine that the only way you would have a motive is that if somehow this lets you make money. So what is the compensation scheme for Janus, if that's in the record or in the complaint or somewhere that we can take note of? Sure. Thank you, Your Honor. The allegation in the complaint is that a different Janus entity, Janus Henderson Distributors, received a daily investor fee tied to issuance of the notes. The lower court, applying this court's well-settled precedent, found that receipt of typical ordinary fees by a business does not rise to the level of motive sufficient to please a lender. They have, the plaintiffs have abandoned, in our view, that argument on appeal. That is not part of the appellate brief. They only argue the second prong of the scientific and integrated consciousness behavior. As to the daily investor fee, we think the lower court was exactly right to the extent that's still an issue, that that kind of allegation that a company simply is earning ordinary fees is not a cognizable basis to plead scientific. Okay. Your Honor, I'm sorry. So the calculator entity of Janus, does it get a fee for, it's just basically computer programming, or is there some duty to be monitoring as things go along that you're getting paid for on a daily basis? I'm sorry, Your Honor. There's no allegation that the calculating entity adds to its fees as a basis to the supports I enter. Okay. There's also no allegation of any statement in any of the offering materials of an ongoing non-attorney duty. And there's this notion that plaintiffs are inclined that there was some temporal, not only an obligation to have someone sitting there monitoring every 15 seconds, comparing the VIX futures index to the inputs, deciding if there was a discrepancy in updating the market, but that they had to do so in real time. And that's not a possible influence from the offering materials as to what anyone was going to be doing in this situation. Your Honor, if there are no more questions, just very briefly, I conclude by noting the type of allegations that this court has found sufficient. In the cases, for instance, like Blanford, a plaintiff's site, you had like multiple confidential witnesses who gave specific facts, citations to specific documents that contradicted the public statements. In cases where it was found insufficient, like Judge Walker's opinion in Donex, that is what this case is like. Broad references to information out in ether somewhere that should have alerted us that the information, the statements were contradicted by other information, that is not sufficient in this circuit. Thank you, counsel. Mr. Eisencraft, you have retained three minutes for rebuttal. Thank you, Your Honor. I would like to address some of the points made by opposing counsel for a moment. First of all, I think that the counsel said something very telling when they're talking about what would happen in terms of the flatline price. They said that, you know, to declare a marked disruption event and do all those things by required committee meetings, and it's a big deal, you know, it's quite possible. And again, this is things we don't know because we're at the motion-to-dismiss stage that they knew about that the number was false. They just didn't fix it because they had to go to committee meeting. It was, you know, after hours. They didn't have time to go to committee meeting. The person who noticed didn't have the authority to change it. These, you know, that is a plausible reason for, you know, them not fixing it, but it doesn't absolve them of liability. If they knew, you know, they were submitting 240 prices that were off by 80 or 90 percent of the market, and $700 million were traded up on those prices. You can't do that. And second, I... Excuse me, Mr. Eska, but the question I was going to ask you, and you heard it at the end of Mr. Halpern's argument, is what's in it for Janice, and why would Janice have a motive to knowingly let false information into the marketplace? Did I just understand you to say that your answer to that question is because they were too lazy to have a committee meeting? Um, we don't have to have a motive. It doesn't have to be, you know, a part of a scheme on behalf of Janice to make herself money. We, you know... Why would... But the question is, is it plausible, and at least as plausible as anything else, to say that they intentionally let this happen? That strikes me as... The immediate question is, well, why would they do that? Why would it be plausible to think that they knowingly put out false information without any warning to the market when, you know, the possibility is they were just asleep at the switch? Because otherwise, why wouldn't you say something? And I think there are a couple of possibilities. One, they were, you know, they noticed, but the person who noticed didn't have... didn't know how or what to do to fix it, and so they just kept distributing it. You know, two, they were asleep at the switch, and they do have a, you know, they were supposed to be monitoring, and they're distributing statements. They're actively making statements. They're saying it's just a computer program spitting out false statements to the market. That's... It was their computer program. You know, if they didn't have some sort of, you know, please don't put false statements on the market, they'll stay on there. So I don't, you know, I can't read their mind. I don't know why. I'm not saying that Janice made an enormous amount of money from this hour, but I'm saying it's very plausible that they noticed, and when counselors were speaking, they'd say, well, you know, they might not have looked at this. They might not have looked at that. They had this data, but they didn't have this data. They might not have had this open their screen. You know, it requires a series of increasingly implausible events for nobody at Janice and nobody at Credit Suisse to have not noticed this for an entire hour, and I think it's plausible that they did notice. Why they didn't correct it immediately, I don't know. So why isn't it just as plausible that the worst case was that they were just very negligent and that there is no scienter here, no intent to defraud, reckless disregard of intent of whether or not it was going to defraud people. I just don't, I don't know. I think this is a tough hurdle given that you have a scheme of manipulation on the other side that one can see huge amounts of profits to the company, and there's all sorts of other arguments that can be made for scienter, but this is an uphill fight for you, I think. I, you know, I don't think, like, certainly the allegations with respect to Credit Suisse and has a definitive money-making reason for keeping the price flat than it is for Janice. However, I don't think it's implausible they were doing their job and doing it with a modicum of awareness. It shouldn't be implausible that, I mean, they're the calculation agent. They don't do much. It's their core responsibility. Janice calculates this value. That was their main job. So, I don't find it implausible that Janice was doing its job as it was supposed to, as they said they were in the offering statements. There's this whole sense of, like, we should, you know, Credit Suisse wouldn't do this. They always do things properly. Janice does this. Yeah, we're saying they're doing things properly. They're actually doing what and if they did what they were supposed to do, then, yeah, they would have noticed and why they didn't correct it. You know, they should have. Why do people do things wrong? Why do people make mistakes? You know, I don't know. I don't know what's in their mind. Yes, ma'am. You're suggesting that they didn't, did or did not notice? They did notice. They noticed? You argue that they noticed. Yes. What is the item that they noticed? They were, one, is that they were calculating the price. Like, they were the ones who were figuring out. Two, it was a frozen price. It didn't move. Yes, it moved, like, two or three little bits over an hour period, but that's not a natural market movement. Any sort of actively traded security, and this was one that was over 160 times volume, moves every tick. It was just frozen. If you had looked at it for more than, you know, 30 seconds, you would know that there's something wrong, and then it was not easy, and this is also the most important hour in the securities history. Like, it was a major news event. It was, the eyes of the market were on this, and presumably, Janice was saying, oh, this, you know, I'm going to pay attention now, but I'm not, you know, back to my, you know, NBC analogy, like, it's the World Series. The pitch was frozen. They didn't notice. Counsel, is your allegation that their failure to notice was negligence or malevolence? We're alleging that it was knowing, like, that they knew it was false. They were disseminating it, and, you know, our argument in the alternative is they were reckless in if they didn't know, but our primary argument is that they knew that it was false. They were disseminating it. They couldn't not know is what you say. It's plausible that they knew. We don't have to say they couldn't not know, but it's more plausible other explanations that they knew. Yes. What is your response on the market manipulation argument that the other side is making that these just normal market activities, that this was just, you know, the way things operate in the market, there was no evidence, no real scantor here, no intent to defraud of any sort, that it was just, you know, operating according to what they were permitted to do, given the instruments out there, and that they had adequately disclosed the risks? Again, I'm kind of in the opposition of arguing that defendants were competent and smart and good at what they do. You know, they issued 16.75 million instruments that they knew they were going to have to hedge, and they knew that that would dramatically shift the balance and, in a spike situation, cause the market to collapse. This happened three times before. They understand supply and demand. At the counter, you know, Mr. Washer said that, you know, we just made things up in our complaint. We didn't. You know, there were – it's a matter of public record that the VIX futures at this time period were trading at 167 times normal volume, and Credit Suisse had an enormous need to hedge, and they had sold 16.75 million of these shares, you know, at, I think, $100 plus an ETN, and if they declared a material adverse event, they get to purchase them back at $6 an ETN, netting them an enormous profit. These are facts. We don't – you know, they're saying, maybe we engaged in swaps. Maybe we did this instead, but they're not – they're not submitting any trading records showing what they're doing, and that would be a matter for summary judgment. You know, I don't have access to their trade book, but we made responsible pleadings based on the publicly available information and based on what Credit Suisse said. And as to, you know, what Credit Suisse's CEO knew, I mean, there was a committee, the CARMAC, that, you know, monitored risk actively and would approve levels of risk, and then also, the CEO said, when this product collapsed, that he collapsed the product to benefit investors. That's, you know, the CEO was – this is a big deal, and, you know, that – and I don't see how investors were protected by the collapse of the product. So, you know, the highest level of credit management was involved with this, you know. So, I don't agree that this is, you know, just business as usual. This is – this is an extraordinary event in the market. A lot of people lost a lot of money very fast, and, you know, I believe it was predictable, and the Credit Suisse knew it was, you know, it was going to happen when they issued these securities in the market. And they knew they were going to have to hedge. They knew they were going to have to hedge more, and they made that announcement in July of 2016. So, that does evidence, to some extent, the fact that they knew that this was high risk and that they would have to hedge. So, there's a lot of knowledge in here. It's just a question of every detail of the scheme that you've laid out. I think that's why the district court decided not to kill the case at that point, because they said, well, this whole scheme is sort of implausible. But I don't know that you have to prove the entire scheme that you've alleged to establish scientifically. Anyway, that's my own take. Okay. Thank you. Thank you, Council. We will reserve positions. Thank you all for a very informative argument.